The opinion of the court was delivered by
Manning, C. J.
The General Assembly at its last session passed art act authorizing the loan to the relator of the bonds of the State to an-amount not exceeding two millions of dollars, the first issue of which should be for the sum of two hundred and fifty thousand dollars only, and providing for subsequent issues upon certain conditions being complied with. Acts 1878, p. 105.
The Governor, in approving the act, signified his intention to provoke a judicial decision upon the constitutional questions involved, and accordingly refused to sign and issue the bonds, whereupon the relator took this proceeding by mandamus to compel the Governor, the Auditor of Public Accounts, and the Secretary of State, to issue two hundred and fifty thousand dollars of bonds of the State in accordance with, and for the purposes expressed in, the act.
The respondents aver that the act is unconstitutional, in that it violates the amendment of the constitution which limits the State debt to fifteen millions of dollars; and because the constitution prohibits the *981 legislature to contract a debt exceeding one hundred thousand dollars, except in certain specified emergencies, oí which” this is not one, without ■at the same time providing adequate means for the payment of the current, interest, and of the principal when it shall become due; and further because it is an attempt to use the taxing power of the State to aid a private enterprise.
The Funding Act was approved January 24, 1874. Its object and purpose was to reduce the floating and bonded debt of the State, and to •consolidate it by authorizing the issue of bonds, which should be exchanged for all valid outstanding bonds theretofore issued, and for all valid warrants drawn previous to its passage, at the rate of sixty cents in consolidated bonds for one dollar in outstanding bonds and valid warrants. The 13th section enacted, that the entire State debt prior to •the year 1914, shall never be increased beyond fifteen millions of dollars, the intent and object of this reduction and consolidation being to re•strict the whole indebtedness of the State to a sum not exceeding that •sum, and to agree with the holders of the consolidated bonds that this indebtedness shall not be increased beyond that sum during the period mentioned in the act. On the same day an amendment to the constitution was approved, to be thereafter submitted to the people for ratification, declaring that the consolidated bonds, to be issued by authority of, and in conformity to the legislative act of same date, created a valid contract between the State and the holders of them, which the State should in no wise impair; and that whenever the debt of the State shall have been reduced below twenty-five millions of dollars, the constitutional limit shall remain at the lowest point reached, beyond which the public debt shall not thereafter be increased, and that this rule shall continue in force until the debt is reduced to fifteen millions, beyond which it shall not be increased. Acts 1874, pp. 39-43. This amendment has become a part of the constitution by its subsequent ratification by the voters at the polls.
This legislation — the funding bill, and the act proposing the constitutional amendment — followed immediately upon the submission to the General Assembly of the Auditor’s report, dated January 1, 1874, wherein is this statement and information.
“The present market value of the actual debt of the State, funded ■and floating, is about fourteen and a half millions. I have the assurance of large bondholders, at home and in Europe, that if the limit of our debt by constitutional amendment, should be fixed at fifteen millions of • dollars, they would accept a new consolidated bond at its face value, and surrender in exchange their old obligations (bonds of all classes and outstanding warrants) at their market value, say about sixty cents on the dollar. The plan of this funding of the State debt is being pre *982 pared in detail, and will be submitted for action at an early day during the present session.”
The sequence of the events, and the conformity of the legislation to the idea of the report, shew that the ‘ plan ’ thus referred to is the Act, shortly afterwards passed.
The same Report states the debt of the State at that time to be,
Bonds outstanding January 1, 1874......................$22,433,800.00
Auditor’s warrants (old)................................. 1,565,702.08
Auditor’s warrants (new)................................ 225,051.22
Certificates of indebtedness............................. 131,785.42
$24,356,338.72
In a tabulated statement appended to the Report, and forming one of the exhibits, the “ total amount of the bonded debt of the State for which the State is actually liable,” is fixed at the figures above set forth, and there are then itemized other bonds for which the State is contingently liable, amounting to $4,803,683.33, which with a sum stated as the ‘ miscellaneous debts’ of the State, make up a sum total of thirty millions of dollars. In exact figures, it is that sum, less eight thousand two hundred and seventeen dollars and seventeen cents.
The funding of that sum at the rate suggested by the Auditor, and adopted by the legislature, will create a consolidated debt of eighteen millions of dollars. The funding of the sum, stated by the Auditor as the actual debt of the State, will create a consolidated debt of a little less than fifteen millions.
It is obvious that the ‘ plan ’ both of the Auditor, and of the legislature, embraced only the latter sum, or in other words, that it excluded the bonds loaned to the Citizens’ Bank and the Consolidated Planters’ Association, which amounted in round numbers to the sum above stated, as debt for which the State was only contingently liable. We have therefore to consider whether the expression in the Act of 1874, which restricts the whole indebtedness of the State to a sum not exceeding fifteen millions of dollars, and the expression in the constitutional amendment, which declares that when the debt has been reduced to that sum, it shall not be -increased beyond it, so control and define the meaning of the legislature in passing the one, and of the people in adopting the other, as to constitute an unqualified inhibition of any increase of the debt of the State, after the whole, both actual and contingent, has reached the prescribed limit.
A rule of statutory construction, the soundness of which is attested by long use, and the frequent and continuing approbation of judicial tribunals, is that the intent of the law-maker is to be ascertained by inquiring what was his motive in legislating — what was the mischief sought to be avoided or remedied, and what the object or good to be *983 attained. Contemporaneous history may be resorted to, and the discussions attendant upon the progress of the legislation through its various stages, as well as the projet of the law, in order to discover the meaning and scope of the law itself. Subsequent legislation also upon the same subject, or upon cognate matters, is useful as furnishing an interpretation of previous words, and in fixing their import.
Now if we separate the expressions referred to from the act, and ignore the general tenour of the law, and disregard, £>r refuse to consider, its history and the circumstances attendant upon, and which provoked its birth, so to speak, there' could be given but one construction of the phraseology of the thirteenth section of the. Funding Act. And that construction is opposed by the history of the legislation, by the intent of its framers as disclosed at every anterior stage of its progress, by the reasons and motives which were assigned as inducements for its adoption, and by arithmetical demonstrations of the basis upon which the consolidated debt was calculated.
It is impossible that the contingent liability of the State, upon the bonds loaned to the Citizens’ and Consolidated Banks, should have entered into the ‘plan’, because funding them with the other liabilities will produce a sum-total, greatly exceeding that fixed by the act and the amendment. It is equally impossible that the State should have contemplated and provided for the compulsory funding of bonds, upon which her liability had not attached, but which must necessarily be contingent for many years after the whole process of funding should have been completed. And we shall advert to this feature further on. In addition to this, we know the exact figures, taken as a basis, upon which new bonds, issued at the rate adopted by the funding bill, will produce the debt-limit, also adopted. You can not reach the end, set in view by the funding legislation, by any other road than that mapped out in the programme of its originators. Diverge from it in search of contingent liabilities at the extremity of one of its by-paths, and you can never reach the end, because you get back into it, burthened with a load which can not be constitutionally put off, and which inexorably stays further progress.
An examination of the action of the bondholders, and of the funding Board, will exhibit a conformity of view as to their understanding of the funding act. This is a summary of the State debt on the first day of the present year, exclusive of the bonds styled ‘not fundable’, as compiled by the present Auditor.
Consolidated debt January 1, 1878 ...........$11,279,780.66
Outstanding old bonds when funded......... 392,280.00
Outstanding general warrants when funded... 113,232.55
$11,785,293.21
*984 and this is the total amount of Consols, after every bond and warrant has been funded, the funding of which was contemplated under the theory we have adopted.
But it is said one of the holders of the bonds loaned to the consolidated Planters Association has not acted on this theory, and we have encouraged others to follow his example. Losassier & Binder have obtained a decree, authorizing the funding at sixty cents on the dollar of three thousand dollars of those bonds. The questions presented in the present case were not considered by us in that case. But suppose all the holders of those bonds should apply to have them funded. The whole amount of them, thus loaned, and outstanding, including those in the Lesassier case, is $506,350.00. Exchange these for consols at the funding rate, and the total debt of the State, exclusive of the loan to the Citizens Bank, is when funded, twelve millions and eighty nine thousand one hundred and three dollars and twenty one cents. ($12,089,103.21)
If the whole of the two millions, contemplated by the Act of 1878, shall be issued, the debt will be below the constitutional limit, unless the figures and tabulated statements of the auditing officers of the government are incorrect.
It is urged upon the part of the respondents that the question, whether the bonds loaned to the property banks are to be considered as a part of the indebtedness of the State, has been already answered adverse to the theory of the relator, in the opinion read by our immediate predecessors in Salomon v. Graham, 23 Annual, 402. But that case was decided in 1871, before the project of funding was conceived — before the ‘plan’, which eliminated these bonds from the debt to be funded, was formed or considered, and of course before that plan was perfected by legislative and constitutional enactment.
The limit then prescribed to the debt was twenty-five millions, and manifestly the word was there used, and was then construed, to include all that could be included in that designation, present or prospective. There had not then been any suggestion or scheme to separate the public debt into two classes, one of which was to be funded, and the other not. The constitutional amendment containing that limitation was not preceded by any act or legislative declaration, shewing that what was meant by the debt of the State was other than its whole indebtedness, however created or arising. The inhibition then was that no future debt should be created that would increase the sum total beyond twenty-five millions. The later inhibition was that no present debt should be funded which would increase the debt, intended to be consolidated, beyond fifteen millions.
So far from, that decision militating against the position of the relator, it goes to confirm the idea, that the later amendment had that in *985 view, and in adopting, as a basis for calculation, the actual debt, to the exclusion of the contingent debt, had in mind the fact that the latter had been judicially construed to be a part of the general debt, and did not provide for it to be funded, because it was contingent.
The Funding Act came under the review of the Supreme Court of the United States in 1875, when the court said ; — “it is contended that the State has deprived itself of the right to issue any bonds at all, except the consolidated bonds created by the Funding Act, to be exchanged for outstanding debts already existing,” and this proposition was not mentioned approvingly, although it was not ruled on, being unnecessary in that case, but in the concluding part of the same opinion, the court say in reference to the disposition to be made of the unissued portion of consols ; — -“it may be objected to this view, that the bondholders of the State may refuse to come in and make the sacrifice required by the act; and in such case, the State ought not to be for ever precluded from making such other disposition of the unissued consolidated bonds as may be beneficial to it, without being injurious to those who have accepted such bonds. If such a state of things should arise, after due time and opportunity shall have been given to test the practicability of carrying out the scheme, it will undoubtedly furnish proper ground for modified legislation, having due regard to the rights already vested.” Board of Liquidation v. McComb, 2 Otto, 531.
Due time has now been given to test the practicability of carrying out the scheme. Four years have passed since the funding bill became a law, and we now know that nearly all the holders of the State’s bonds have not refused to come in, but have consented to the sacrifice, and sufficient time has been given to the holders of the residue of the fund-able bonds and warrants for them to come in, and share the advantages of the scheme. We also know that the holders of the bonds loaned to the Citizens Bank will not come in, since their bonds are not a part of the debt fundable in consols. Shall the State be forever precluded from making any other disposition of the unissued consolidated bonds that may7 be deemed beneficial to it by the legislature ?
There is not wanting legislation evincing an animus to prevent any part of the fundable debt, which shall remain unexchanged for consols, from being redeemed or the interest upon it paid. It would be difficult to devise an enactment, more stringent or 'more comprehensive, than that which deprived any officer of the State of the power to assess, collect, or enforce the payment of any tax for the payment of any of the bonds, or the interest thereon, which were contemplated to be funded by the Act of 1874 — which prohibited to all courts and judges, or any tribunals, to entertain or take-jurisdiction of suits to enforce the payment of such tax — which declared that such tax shall not be recorded by any *986 officer so as to operate a lien, and if recorded, that it should not operate a lien — which abrogated all penalties for the non-payment of such tax, and declared that the bonds of tax collectors should not cover such t.ax,, and if they collected it, neither themselves nor their sureties should be liable to pay it to any person. And in the same act, to ensure the payment of the new consolidated bonds, principal and interest, and to attract the confidence of the old bondholders to them, they were exempted from the provisions of these copious and all embracing prohibitions. Acts 1874, p. 94.
We have before said that controversy of the policy or impolicy, the good or bad faith, of the Funding Act is closed, because of the numerous and grave complications that would arise upon, and from, the opening of that question. Lord Cecil vs. Board of Liquidation, ante 35. We regard the faith of the State as irrevocably pledged to the payment of her consolidated bonds, issued under authority of that act, and to the payment of such other bonds as may be issued under the sanction of the decree we shall make herein. The contract with the holders of these bonds, is one which, in the language of the constitutional amendment, the State can by no means and in no wise impair. This utterance, fortified by judicial sanction, contains the double assurance to the bondholders, that their securities shall not be impaired or imperilled, and to the tax payers, that their burthens shall not be augmented beyond the constitutional limit. Until the actual debt of the State has reached the limit of fifteen millions of dollars, exclusive of the contingent liabilities which were not embraced within the Funding Act, and the constitutional amendment, it is competent for the legislature to provide for the issuing of bonds as a loan to such enterprises as fall within its constitutional power, provided other requirements are complied with, and we shall now proceed to the inquiry whether these requirements have been complied with in the present instance.
Has the legislature complied with the constitutional requirement of providing in the law creating this debt adequate ways and means for the payment of the current interest, and of the principal when it shall have become due. The relator is required by the Act to deposit its own first mortgage bonds with the Auditor, and to pledge them to the State, for the guarantee of the payment of the State bonds which shall be issued, to an amount exceeding by one fourth the amount of the State bonds delivered to the Company. The whole amount of bonds to be issued by the company is restricted to five millions, one half of which will be thus pledged for the redemption of the State bonds, in the event the full issue of the latter authorized by the Act is made, and this restriction is evidently made to prevent the weakening the security which the State has required for her protection. Fifty thousand dollars of the State bonds *987 are to be extinguished annually by the company, commencing five years after the completion of its line to Shreveport, and this annual rate of' extinguishment is to continue until the near approach of the maturity of the State bonds, when they are to be extinguished in such annual proportion as shall ensure the payment and cancellation of the whole of them by their maturity.
It may be that these salutary precautions will not completely ensure the object for which they are made. Human affairs depend upon too many contingencies to enable the wisest individual, or the most prudent, public Body to concert a scheme, which is to be practically worked out in the future, and provide with unerring certainty for the attainment of specific results. The legislature has provided the ‘ adequate means ’ in the constitutional sense.
The third and last objection to the constitutionality of the Act is, that the State has not the right to assume or create a debt, which must eventually be met by the use of her taxing power, in aid of an enterprise of this kind.
The argument is that this enterprise is private, as contradistinguished from public, and hence that the public money cannot be rightfully appropriated to its aid. The discussion of this question was at one time practically useful, as well as theoretically interesting. Nearly all the States, if not quite all, have been at one time or another violently agitated by this controversy, and when the arena of conflict was transferred from the hustings to the courts, each side found ample grounds to fortify it in its opinions. There was rarely an unanimous court in pronouncing a judgment for or against the power, and opinions are yet divided between the disputants as to what should have been the judgment pronounced. But as a practical question, it no longer has any interest. The battle over it has been fought, and has been lost by those who denied the possession of the power. A judge, who took pains to collate the information, says the legislation has been sustained in nineteen out of twenty-one States. Swayne, J. in Talcott’s case, 19 Wall. 666.
It may now be regarded as settled doctrine in this country that, no tax can be legally authorized for a purpose which is private, or to put it in another form, for a purpose which is not public. It is not however quite plain always what is a public purpose, but the great preponderance of judicial judgments is in favor of the competency of a legislature, in the absence of constitutional restraint, to authorize loans-to railway companies, and to provide for their payment by the issue and sale of bonds. But a statute which authorizes the issue of bonds, to be redeemed by taxation, in aid of classes or individuals, or in aid of manufacturing enterprises of individuals.or private corporations is void, because it falls within the meaning of the rule which prohibits aid to a *988 private, as contradistinguished from a public purpose, although the local public might be benefitted thereby in a collateral way. Dillon, Mundo. Corp. 3586-591. Monograph Munic. Bonds, 2 South. Law Rev. 438.
The bonds authorized by the Act of March 11, 1878, fall within the former class, and the provision for issuing them, under the conditions therein imposed, is not repugnant to the constitution. Therefore,
'It is ordered, adjudged, and decreed, that the judgment of the lower court is avoided and reversed, and that the mandamus be made peremptory, ordering the signing of bonds of the State to the' amount of two hundred and fifty thousand dollars, and their delivery, to the relator, upon compliance by the relator with the conditions of the above named Act, and that the respondents pay the costs hereof.